Roy A. Katriel (SBN 265463)
THE KATRIEL LAW FIRM
4225 Executive Square, Suite 600
La Jolla, California 92037
Telephone: (858) 242-5642
Facsimile:  (858) 430-3719
e-mail: rak@katriellaw.com

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ADRIENNE MOORE, On Behalf Of Herself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 5:14-cv-02269-LHK<br><br>**PLAINTIFF ADRIENNE MOORE'S NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION**<br><br>Judge:          **Hon. Lucy H. Koh**<br>**Hearing Date: July 30, 2015**<br>**Time:            1:30 pm**<br>**Courtroom:   8, 4th Floor**<br><br>**PUBLIC REDACTED VERSION** |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION…………………………………………………………..1

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION……………………….............1

INTRODUCTION, FACTUAL BACKGROUND, AND SUMMARY OF ARGUMENT……….1

  iMessage's Pervasive, Continuous, And Systemic Disruption Of Text Messages…....…..2

  The Appropriateness Of Classwide Treatment Of Moore's Claims……...………………10

ARGUMENT……………………………………………………………………………………..11

I.  MOORE MEETS THE CLASS CERTIFICATION STANDARDS……………..…….11

  A. The Numerosity Requirement Is Readily Satisfied…………………………………...11

  B. The Typicality Requirement Is Readily Met……………………………...………12

  C. Moore And Her Counsel Are Adequate Class Representatives…………….…………13

    1. Moore Is An Adequate Class Representative……………………………….13

    2. Moore's Counsel Is An Adequate Representative Of The Class………………16

II.  COMMON QUESTIONS EXIST AND PREDOMINATE………………..………….17

  A. Existence of The Alleged Agreements Poses A Predominating Common Question.......................................................................................................17

  B. Apple's Knowledge Of The Contractual Relationship Is Also Subject To Common And Predominating Proof……………………………………………...…………18

  C. Apple's Intent Is A Common Predominating Question……………………………...20

  D. The Contractual Breach Poses A Common Predominating Question……...………..21

III.  DETERMINING ADVERSE IMPACT AND QUANTIFYING CLASSWIDE DAMAGES ARE SUBJECT TO COMMON, PREDOMINATING PROOF…………..22

  A. All Class Members Were Subject To Adverse Impact………………..………….23

  B. There Is A Methodology For Calculating Classwide Damages……………………25

IV.  THE CLASS IS ASCERTAINABLE……………………………………………...25

CONCLUSION……………………………………………………...……………….…25

# **TABLE OF AUTHORITIES**

**Cases:**

*A.H.D.C. v. City of Fresno*,
2000 WL 35810723 (E.D. Cal. Aug. 31, 2000)……………………………………..……20

*Akaosugi v. Benihana Nat'l Corp.*,
282 F.R.D. 241 (N.D. Cal. 2012)…………………………………………………………12

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)………………………………………………………………………17

*Amgen Inc. v. Connecticut Ret. Plans*,
133 S. Ct. 1184 (2011)…………………………………………………………………...11

*Ammari Electronics v. Pacific Bell Directory*,
2011 WL 5547588 (2011)………………………………………………………….…..23

*Bruton v. Gerber Prods.*,
2014 WL 2860995 (N.D. Cal. Jun. 23, 2014)……………………………………………...25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011)……………………………………………………………………17

*Estrella v. Freedom Financial Network LLC*,
2010 WL 2231790 (N.D. Cal. Jun. 2, 2010)……………………………………………….2

*Gaudin v. Saxon Mortg. Srvcs.*,
297 F.R.D. 417 (N.D. Cal. 2013)……………………………………………….…..…17

*In re Apple iPod iTunes Antitrust Litig.*,
2008 WL 5574487 (N.D. Cal. Dec. 22, 2008). …………………………………………16

*In re Cathode Ray Tube Antitrust Litig.*,
2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)……………………………….……...22

*In re First Capital Corp. Financial Prods. Sec. Litig.*,
1993 WL 144861 (C.D. Cal. Feb. 26, 1993)…………………………………..……………2

*In re Heritage Bond Litig.*,
2004 WL 1638201 (C.D. Cal. Jul. 12, 2004)……………………………………………12

*In re High-Tech Employee Antitrust Litig.*,
985 F. Supp.2d 1167 (N.D. Cal. 2013)……………………………...…..…...11, 13, 17

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010)……………………………………...……………17

*Kohen v. PIMCO*,
571 F.3d 672 (7th Cir. 2009)……………………………………….……………21-22

*Leyva v. Medline Indus.*,
716 F.3d 510 (9th Cir. 2013)………………………………………………….……23

*Long Beach Drug Co. v. United Drug Co.*,
13 Cal.2d 158 (1939)………………………………………………...…………….23

*Moore v. Apple, Inc.*,
2014 WL 5830374 (N.D. Cal. Nov. 10, 2014)…………………………….………20

*Ogden v. Bumble Bee Foods*,
2014 WL 27527 (N.D. Cal. Jan. 2, 2014) …………………………………………24

*Overka v. American Airlines, Inc.*,
265 F.R.D. 14 (D. Mass. 2010)……………………………………………………..2

*Park v. The Thompson Corp.*,
2008 WL 4684232 (S.D.N.Y. Oct. 22,  2008)…………………………..…………17

*Quelimane Co. v. Stewart Title Guaranty Co.*,
19 Cal.4th 26 (1998)………………………………………………………..20-21

*Ramona Manor Convalescent Hosp. v. Care Enterprises*,
177 Cal. App. 1120 (1986)………………………………………..………19-20

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992)……………………………………...……………12

*Sebastian Int'l, Inc. v. Russolillo*,
162 F. Supp.2d 1198 (C.D. Cal. 2001)……………………………………………..19

*Simpson v. Fireman's Fund Ins. Co.*,
231 F.R.D. 391 (N.D. Cal. 2005)……………………………………..……………12

*Vizzi v. Mitsubishi Motors North America*,
No. 08-cv-650-JVS (C.D. Cal.)……………………………………………………16

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)………………………………………………...……11, 17

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

1

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969)……………………………………………………………….…22

2

3

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180, as amended by 273 F.3d 1266 (9th Cir. 2001)…………………….…………11

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on July 30, 2015 at 1:30 pm, at Courtroom 8 of the United States District Court for the Northern District of California's San Jose Division, Plaintiff Adrienne Moore, by and through her undersigned counsel, will move pursuant to Federal Rule of Civil Procedure 23 for class certification.  This motion is based on the facts and arguments set forth in the accompanying Memorandum in Support, the Declaration of Roy A. Katriel, as well as the expert Declaration of Matthew Green, Ph.D. and the expert Declaration of Mark Dwyer, Ph.D., along with their respective exhibits, arguments of counsel, as well as all other filings in this case and such other matters as the Court may otherwise consider.

Plaintiff seeks an Order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing her as class representative, and her counsel as Class Counsel.

Plaintiff Adrienne Moore seeks to certify a Class of:

All persons within the United States who, during the time period October 12, 2011 to the present, switched their wireless telephone account by porting their cellular telephone number from an Apple iPhone device that was operated by iOS version 5 or later to a non-Apple cellular telephone.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**

**INTRODUCTION, FACTUAL BACKGROUND, AND SUMMARY OF ARGUMENT**

This case is tailor made for class certification.  The record detailed below documents that since its launch in October 2011, Apple's iMessage application prevents former iPhone users from receiving text messages sent to them from other iPhone devices once these users replace their iPhones with any non-Apple cellular phone.   Plaintiff Adrienne Moore alleges that, through its employ of iMessage, Apple has tortiously interfered with the contractual rights of Class members like herself, who are parties to wireless agreements with cellular carriers, like Verizon Wireless, AT&T, Sprint, or T-Mobile.  Those agreements permit Class members to send and receive text messages.  Apple's iMessage interferes with that contractual relationship by preventing the delivery of text messages sent by iPhone users to former iPhone users who now own a non-Apple phone.  Moore's Class Action Complaint ("CAC") alleges claims for tortious interference with contractual relations as well as a claim under the California Unfair Competition

1   Law premised on the same conduct.  *See* CAC at ¶¶ 35-40; 46-51.

2        This Court, other California federal courts, as well as courts across the country, have

3   repeatedly certified such tortious interference claims (and UCL claims premised on such tortious

4   interference with contract) as class actions.  *See, e.g., Estrella v. Freedom Financial Network*

5   *LLC*, 2010 WL 2231790, at *10 (N.D. Cal. Jun. 2, 2010) (granting class certification in action

6   alleging UCL violation  premised on tortious interference with contract and finding that

7   "plaintiffs have satisfied their burden of showing that they are typical of the class with respect to

8   the tortious interference claim."); *In re First Capital Corp. Financial Prods. Sec. Litig.*, 1993 WL

9   144861, at *3 (C.D. Cal. Feb. 26, 1993) (granting class certification claim on behalf of purchasers

10   who alleged claims for *inter alia*, "tortious interference with business relationship against

11   defendants American Express, Shearson Holdings, and Shearson."); *Overka v. American Airlines,*

12   *Inc.*, 265 F.R.D. 14, 18 (D. Mass. 2010) (certifying nationwide class of skycap workers who

13   alleged American Airlines tortiously interfered with the class plaintiffs' contractual relations with

14   passengers checking luggage; court found that "there are a substantial number of liability issues

15   that are common to the class.).  The compelling and largely undisputed facts presented here

16   support class certification in this case as well.

17   **iMessage's Pervasive, Continuous, And Systemic Disruption Of Text Messages.**

18        iMessage was launched by Apple as part of its iOS 5 operating system in October 2011.

19   *See* CAC, at ¶ 11. As Dr. Green explains, iMessage was designed as an alternate means of

20   allowing users of iOS devices to send text messages to other iOS device users through Apple's

21   servers rather than by resorting to the user's wireless network. *See* Ex. 1 to Katriel Decl. [Green

22   Expert Report], at ¶ 14.

23        Almost immediately after iMessage's launch, it became clear that there was a troubling

24   "bug"—iOS device users who switched to a non-Apple phone found that they were not receiving

25   text messages on their new non-Apple phone when the messages were sent from other iPhones.

26   Apple's systems still detected that former user's phone number as being registered with

27   iMessage, such that text messages from iPhones to that user were being routed through iMessage

28

Pltf. Adrienne Moore's Mtn. For Class Certif.                          *Moore v. Apple Inc.*,
                                                                       No. 5:14-cv-02269-LHK

despite the fact that the intended recipient no longer owned an Apple phone and hence could not receive iMessages. Neither the sender nor the intended recipient received any notification that a text message delivery had failed.

All the foregoing narrative was documented merely months after iMessage's launch. A news article dated January 5, 2012 entitled, "iMessage Bug Traps Android Converters' Personal Conversations . . . But There's A Fix!" reported about the iMessages "bug:"

There's just one problem:

If you switch to an Android device from an iPhone (with iMessage activated), anyone who's previously been sending you iMessages will no longer be able to send you texts. This is because there is apparently a bug with the iMessage system that doesn't deactivate iMessage, even after you've switched your phone number to another device.

Ex. 3 to Katriel Decl. at page    of 1.



Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

—3—



Pltf. Adrienne Moore's Mtn. For Class Certif.

Moore v. Apple Inc.
No. 5:14-cv-02269-LHK

4



Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

-5-



Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

6--



Shortly thereafter, in a webpage that was last modified by Apple on March 10, 2014, Apple was forced to acknowledge that:

> Go to Settings > Messages and turn off iMessage if you plan to transfer your SIM card of phone number from an iPhone to a device that does not support iMessage. ***If you don't, other iOS devices might continue to try to send you messages using iMessage, instead of SMS or MMS, for up to 45 days.***

Ex. 14 to Katriel Decl. at page 2 of 3 (emphasis added).

Of course, this disclosure or warning came about *post hoc* and in a specific webpage that a users may or may not stumble upon. iPhone users were never advised by Apple when they activated their phones or otherwise downloaded iMessage in iOS 5 that use of iMessage would lead to disruption of incoming text messages when the users switched to a non-Apple phone if the user did not deregister from iMessages before making the switch. The iOS 5 and iMessage license agreement contains no such disclosure. *See* Ex. 15 to Katriel Decl. at ¶4.e. (iOS license agreement containing description and disclosures about iMessage but containing no disclosure about text message disruption that would occur upon switching to non-Apple phone nor any instruction that user was to deregister from iMessage prior to switching to non-Apple phone).

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

−7−

Pltf. Adrienne Moore's Mtn. For Class Certif.

Moore v. Apple Inc.
No. 5:14-cv-02269-LHK

- 8 -

Pltf. Adrienne Moore's Mtn. For Class Certif.

Moore v. Apple Inc.
No. 5:14-cv-02269-LHK

−9−

## The Appropriateness Of Classwide Treatment Of Moore's Claims

As the foregoing detailed factual narrative demonstrates, the iMessage-induced disruption of text messages to the Class members was not a mere idiosyncratic or anomalous occurrence. It was and remains a pervasive problem that plagues the members of the Class in common fashion regardless of: what carrier they subscribe to; what non-Apple device they switch to; what Apple iPhone model they used; or, even, whether they self-deregistered from iMessage (because, as Apple and Google documents note, the deregistration tool does not function to address the problem). Unsurprisingly, therefore, Dr. Matthew Green, a renowned expert in communications technology who holds a Doctorate in Computer Science from the Johns Hopkins University and has vast litigation experience, opines that:



All the other elements of Moore's tortious interference with contract and UCL claims are also susceptible to classwide proof and treatment. All smartphones today are capable of sending and receiving text messages. As detailed in Section II.A. *infra*, moreover, all cellular carrier agreements today provide class members with the ability to send and receive text messages. Yet, it is this very feature and contractual right to receive text messages that Class members paid for that was interfered with by the systemic and pervasive flaw in Apple's iMessage application.

Moore's expert economist, Dr. Mark Dwyer, who holds a Doctorate in Economics from the University of Rochester with a specialization in econometrics and whose expert testimony has been relied upon recently by this Court in granting class certification in another consumer class action[1], provides testimony documenting both the common adverse impact suffered by the Class, as well as providing a common methodology to calculate classwide damages (a methodology that

---

[1] *See In re SRAM Antitrust Litig.*, 264 F.R.D. 603, 616 (N.D. Cal. 2009)

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

-10-

Dr. Dwyer not only proffers but has actually employed in this case to calculate a preliminary damages figure). *See* Ex. 2 to Katriel Decl [Dwyer Expert Report] and Sections III.A and B *infra*.

Because the remaining elements of Moore's tortious interference and UCL claims are all subject to common proof across the Class, and each of the requirements of Rule 23(a) and (b)(3) are also readily satisfied, class certification is in order.

## ARGUMENT

### I.     MOORE MEETS THE CLASS CERTIFICATION STANDARDS.

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. To obtain class certification, Plaintiff bears the burden of showing that she has met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule." *Wal–Mart,* 131 S.Ct. at 2551. "[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc. v. Conn. Ret. Plans,* 133 S.Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551(2011)). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen,* 133 S.Ct. at 1194–95. "Merits questions may be considered to the extent—***but only to the extent***—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195 (quoted in *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp.2d 1167, 1179 (N.D. Cal. 2013) (Koh, J.,)) (emphasis added).

Because Moore satisfies the pertinent Rule 23 requirements, her motion should be granted.

#### A.   The Numerosity Requirement Is Readily Satisfied.

Federal Rule of Civil Procedure 23(a)(1) provides that, "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  This so-called "numerosity" requirement is readily satisfied here.  "The numerosity requirement of Rule

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

–11–

23(a)(1) is satisfied when 'joinder of all members is impracticable.'" *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 253 (N.D. Cal. 2012) (quoting Fed. R. Civ. P. 23(a)(1)). "The numerosity requirement is not tied to any fixed numerical threshold, but courts generally find the numerosity requirement satisfied when a class includes at least forty members." *Id.* at 253-54.

Here, there can be no reasonable dispute as the numerosity of the proposed Class. Based on his analysis of cell phone account transfer surveys, Dr. Dwyer has estimated the Class size to be comprised of approximately 15.6 million individuals. *See* Ex. 2 to Katriel Decl., at ¶ 45. This dovetails with documents produced by Verizon, which show that since October 2011 to late 2014, approximately 3.2 million subscribers of Verizon *alone* switched from an iPhone to a non-iPhone. *See* Ex. 22 to Katriel Decl. at Bates-stamp VZ000001.

### B. The Typicality Requirement Is Readily Met.

Federal Rule of Civil Procedure 23(a)(3) requires that, "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d 1011, 1020 (9th Cir. 1998). "In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff." *Simpson v. Fireman's Fund Ins. Co.,* 231 F.R.D. 391, 396 (N.D. Cal. 2005) (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992)). Typicality does not require that "all class members suffer the same injury as the named class representative." *Id.* Thus, "the typicality requirement is not demanding." *In re Heritage Bond Litig.*, 2004 WL 1638201, at *4 (C.D. Cal. Jul. 12, 2004).

Moore's claims are typical of the claims of the absent Class members she seeks to represent. Like all putative class members, Moore asserts claims for tortious interference with contractual relations and a derivative claim under the UCL. *See* CAC, at ¶¶ 35-40; 46-51. Thus, the legal theory she asserts on her own behalf is co-extensive and identical to the legal theory applicable to any class member's claim. Like all class members, Moore alleges that she has a contract or wireless agreement with a wireless carrier (in her case, Verizon Wireless) that

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

–12–

1   permitted her to obtain and receive text messages.  *Id*. at ¶ 5.

2       **C.  Moore And Her Counsel Are Adequate Class Representatives.**

3       Federal Rule of Civil Procedure 23(a)(4) requires that, "the representative parties will

4   fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "Legal adequacy

5   of a class representative under Rule 23(a)(4) turns on two inquiries: (1) whether named plaintiffs

6   and their counsel have any conflicts of interest with other class members, and (2) whether named

7   plaintiffs and their counsel will 'prosecute the action vigorously on behalf of the class.'" *In re*

8   *High-Tech Employee Antitrust Litig.*, 985 F. Supp.2d at 1181(internal quotations omitted).

9       **1.  Moore Is An Adequate Class Representative.**

10      Moore is an adequate representative of the class.  There are no conflicts between her claim

11  and the claims of the absent class members.  Moore was an iPhone owner and Verizon Wireless

12  subscriber who experienced non-receipt of text messages sent to her from iPhone users once

13  Moore switched to a Samsung 5 phone as a replacement for her iPhone.  *See* CAC, at ¶ 1.  Moore

14  produced documentation substantiating her claim and establishing her adequacy to represent the

15  class.  She provided her Verizon purchase receipt for her iPhone 4, which also documented that

16  she was a party to a "Nationwide Talk and Text 900" wireless plan.  *See* Ex. 23 to Katriel Decl. at

17  Bates-stamps MOORE00168 -169.  She provided the copy of her purchase receipt for her

18  Samsung 5 phone in April 2014.  *See* Ex. 24 to Katriel Decl. at Bates-stamp MOORE000182.

19  She also provided documentation as to her current account and wireless agreement at Verizon,

20  showing that she was enrolled in the "Nationwide Select With Unlimited Nights & Weekends"

21  plan under the same telephone number that she had used ever since purchasing her iPhone device.

22  Ex. 25 to Katriel Decl. at Bates-stamp MOORE000170.  She provided copies of her Verizon

23  Wireless account Profile Page, identifying her as the "Account Owner" or "Account Manager" for

24  that Verizon account with the same telephone number.  Ex. 26 to Katriel Decl. at Bates-stamp

25  MOORE000185.  She also provided bank statements showing the payments made by her to

26  Verizon for her wireless service agreement.  Ex. 27 to Katriel Decl.

27      Ms. Moore also provided documentary evidence and Interrogatory responses confirming

Pltf. Adrienne Moore's Mtn. For Class Certif.                              *Moore v. Apple Inc.*,
                                                                         No. 5:14-cv-02269-LHK

28                                         –13–

1   that, upon switching from her Apple iPhone to a Samsung 5, she began experiencing undelivered

2   text messages. This includes a contemporaneous email exchange with her boss who had texted

3   Moore demanding a job assignment, but had not received a reply from Moore. Moore's boss then

4   emailed her to ascertain why Moore had neither completed the requested task nor responded.

5   Moore then emailed back, "[s]orry, I'm having an issue with not receiving texts from iPhones

6   since I got my Samsung phone. Can you please tell me what you need again?" Ex. 28 to Katriel

7   Decl. at Bates-stamp MOORE000161. In her Interrogatory responses, Moore identified two other

8   persons who had texted her from an iPhone after Moore switched from her iPhone to a Samsung

9   phone and whose text messages Moore later learned she did not receive. *See* Ex. 29 to Katriel

10  Decl. at Response No. 1. At deposition, Ms. Moore explained that missed texts from these

11  senders likely involved numerous texts because she texted these individuals multiple times a day.

12  *See* Ex. 30 to Katriel Decl.. at 70:11-19.

13          Moore also produced documents evidencing her contacts with Apple Customer Support

14  when she complained about not receiving text messages after switching away from an iPhone, and

15  for which she was assigned a ticket case number by Apple Support. *See* Ex. 31 to Katriel Decl.

16  For another call with Apple (because her prior contact did not resolve the issue and she continued

17  having undelivered text messages), she kept and provided the name, telephone number, and direct

18  extension number of the person (Rhea) at Apple's Customer Service with whom she spoke about

19  her text message difficulties. *See* Ex. 32 to Katriel Decl.

20          Nor is Moore's adequacy limited to representing just Verizon subscribers or just those

21  who had owned a particular iPhone model, or just those who switched their iPhones to a Samsung

22  cellular phone, as opposed to another phone brand.



Pltf. Adrienne Moore's Mtn. For Class Certif.                                   *Moore v. Apple Inc.*
                                                                                No. 5:14-cv-02269-LHK

-14-



Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

-15-



### 2. Moore's Counsel Is An Adequate Representative Of The Class.

Moore has also retained competent counsel who is well versed and experienced in class action litigation. A firm resume of The Katriel Law Firm is attached as Exhibit 33 to the Katriel Declaration, and summarizes the firm's vast experience in complex class action litigation. Just last month, for example, the Honorable Thelton E. Henderson of this Court appointed The Katriel Law Firm as co-lead Class Counsel in granting Preliminary Approval to a nationwide class action settlement that The Katriel Law Firm has been litigating for the past three years. *See* Ex. 34 to Katriel Decl. at ¶ 5. This Court appointed The Katriel Law Firm as co-lead counsel in a nationwide antitrust action against Apple that ultimately went to trial after 10 years of litigation. *See In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *1 (N.D. Cal. Dec. 22, 2008). Other federal courts have favorably commented on the quality of The Katriel Law Firm's representation of various consumer classes. *See, e.g.. Vizzi v. Mitsubishi Motors North America,* No. 08-cv-650-JVS (C.D. Cal ) [Order approving class action settlement], at 4. ("the Court is sufficiently impressed with the experience and competency of class counsel, The Katriel Law

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.,*
No. 5:14-cv-02269-LHK

−16−

1  Firm."); *Park v. The Thompson Corp.*, 2008 WL 4684232, at *6 (S.D.N.Y. Oct. 22, 2008) (The

2  Katriel Law Firm: "Class Counsel have provided extremely high-quality representation.").

3  ## II.  COMMON QUESTIONS EXIST AND PREDOMINATE.

4      As the Supreme Court recently underscored, "for purposes of Rule 23(a)(2) [e]ven a

5  single [common] question will do." *Wal–Mart*, 131 S.Ct. at 2556.  Where questions common to

6  class members present significant issues that can be resolved in a single adjudication 'there is

7  clear justification for handling the dispute on a representative rather than on an individual basis.'"

8  *Gaudin v. Saxon Mortg. Srvcs.*, 297 F.R.D. 417, 424-25 (N.D. Cal. 2013) (quoting *Amchem*

9  *Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997)).  This is so if the common contention is "of

10  such a nature that it is capable of classwide resolution—which means that determination of its

11  truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

12  stroke." *Wal–Mart,* 131 S.Ct. at 2551. "What matters to class certification . . . is not the raising of

13  common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to

14  generate common answers apt to drive the resolution of the litigation." *Id.*

15      Predominance focuses on "the legal or factual questions that qualify each class member's

16  case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive

17  to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623 (quoted in *In re*

18  *High-Tech Employee Antitrust Litig.*, 985 F. Supp.2d at 1182). "Considering whether questions of

19  law or fact common to class members predominate begins . . . with the elements of the underlying

20  causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S. Ct. 2179, 2184 (2011).  A

21  court must analyze these elements to "determine which are subject to common proof and which

22  are subject to individualized proof." *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D.

23  Cal. 2010).   We do so below, and show that the predominance requirement is readily met.

24      ### A.  Existence of The Alleged Agreements Poses A Predominating Common Question.

25      Moore's claims stem from the premise that she and the Class members are entitled to

26  receive text messages pursuant to her and the Class members' wireless agreement plans.  Thus,

27  these agreements' provision for a subscriber's ability to receive text messages is a predominating

Pltf. Adrienne Moore's Mtn. For Class Certif.

28                                                                  *Moore v. Apple Inc.,*
                                                                     No. 5:14-cv-02269-LHK

common question. Proof of Class members' ability, under their wireless agreements, to avail themselves of text messaging is not subject to individual proof, as virtually all plans today and all smartphones permit text messaging. Ms. Moore's own documented wireless plan with Verizon was aptly called "Nationwide Talk & Text 900," and her documents show that it entitled her to obtain "unlimited messaging." *See* Exs. 23 and 25 to Katriel Decl. The availability of text messaging is common across all major U.S. wireless carriers, such that regardless of what carrier a particular Class member subscribed to, that Class member had the ability, as part of her plan, to receive text messages (either in an unlimited basis, a prepaid bundle, or on a pay-per-message fee). *See* Ex. 2 to Katriel Decl. [Dwyer Expert Report], at ¶¶ 22-23.

The carriers' own documentation bears this out. Verizon's website, for example, confirms that, "Text messaging is automatically included in your wireless services." Ex. 35 to Katriel Decl. T-Mobile's website is to the same effect, alerting users as follows: "Q: Do I need to add this service to my line to use it ?  A: No. Simple Choice Plans include unlimited text and picture texting." Ex. 36 to Katriel Decl. The same holds true for AT&T, whose website touts that "Unlimited Talk & Text" is included in their plans: "Unlimited domestic calls and messaging for all your phones." Ex. 37 to Katriel Decl. The salient point is that proving whether Class members' wireless plans granted them a right to obtain text messaging is a question that can be addressed by common evidence obtained from the carriers, without the need to read through every individual Class members' wireless plan. Moreover, because all carriers today make text messaging available on all their plans (something that can also be verified or disproven by resort to evidence obtained from the carriers), all Class members are similarly situated in having a contractual right under their respective wireless plans to obtain text messaging.

## B.  Apple's Knowledge Of The Contractual Relationship Is Also Subject To Common And Predominating Proof.

Apple's knowledge of the contractual relationship between U.S. wireless carriers and Class members pursuant to which Class members were allowed to receive text messages is also subject to common proof. As this brief's detailed "Factual Background" shows. ███████

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*
No. 5:14-cv-02269-LHK

-18-



Thus, Apple was made aware of the existence of contractual agreements whereby subscribers of each of the U.S. wireless carriers expected to receive text messages but found themselves not receiving such messages sent from iPhones once the subscribers switched to a non-Apple phone.

The law is clear that, to fulfill the knowledge element of a tortious interference with contract claim, it is unnecessary to show that the defendant was made aware of the particular contract that was allegedly interfered with. Instead, all that is required is that the defendant be generally aware that such contractual relationships existed and were being interfered with, *even if the specific affected contract is not called to the defendant's attention*. The federal district court for the Central District of California has explained this level of proof in detail:

> *1. Knowledge of the contracts between Plaintiff and the third party.*
>
> *Defendants argue that in order to prove that 'defendants have knowledge of the contracts between Plaintiff and the third party,' Plaintiff must identify the specific contractual relations that have allegedly been disrupted. Plaintiff disagrees, arguing that while Defendants must know of the existence of the contracts, there is no requirement that they know the specific identities of the contracting parties.*
>
> . . .
>
> **This Court agrees that in order to satisfy the second element of this tort under California law, the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted.** Contrary to the Defendants' interpretation, it seems that the second element of this intentional tort relates to the state of mind of the defendant at the time that the alleged tort occurred. If a potential defendant was completely unaware of contractual relations with a third party, then it would be impossible to infer any intent to interfere on the defendant's part. However, such intent can certainly be inferred if the defendant knows that contractual relations with a third party exist, but does not know the specific identity of the contractual party.

*Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp.2d 1198, 1203-04 (C.D. Cal. 2001) (emphasis added); *see also Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal. App. 1120,

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

- 19 -

1133 (1986) ("We are not persuaded knowledge of the injured party's specific identity or name is a prerequisite to recovery for either IIK [intentional interference with contract] or IIPEA. . . . Care's decision to hold over beyond the termination of the lease under which it had possession was *made with the knowledge that such action would frustrate the legitimate contractual expectations of a specific, albeit unnamed, new lessee. That is all it was required to know to incur liability.*") (emphasis added).

In that vein, California federal district courts have held that a defendant's "mere constructive knowledge" of the existence of a contract, without having actual knowledge of it, suffices to satisfy the "knowledge" element of a tortious interference with contract claim. *See A.H.D.C. v. City of Fresno*, 2000 WL 35810723, at *23 (E.D. Cal. Aug. 31, 2000) ("Plaintiffs' evidence is sufficient to establish that all signatory Defendants had at least constructive knowledge of the purchase contract and Defendants' conduct could be interpreted as interference with the contract by thwarting the multi-family housing development objective.").[2]

Whether Apple had the requisite actual or constructive knowledge, within the meaning of California law, of the existence of Class members' contracts that were allegedly being interfered with as a result of iMessage's flaw is also a question of common proof.

**C. Apple's Intent Is A Common Predominating Question.**

Whether Apple had the requisite intent for a tortious interference with contract claim is subject to common proof. In denying Apple's motion to dismiss Moore's tortious interference claim, this Court has already held that "'intentional acts' do not require that the defendant's primary motive be to disrupt a contract. This element can also be satisfied if 'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his [or her] action.'" *Moore v. Apple, Inc.*, 2014 WL 5830374, at *8 (N.D. Cal. Nov. 10, 2014) (quoting *Quelimane Co. v. Stewart Title*

---

[2] Moore provided Apple with actual knowledge of her inability to receive text messages, as she complained to Apple about her non-receipt of text messages. *See* Exs. 31 and 32 to Katriel Decl.

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

–20–

*Guaranty Co.*, 19 Cal.4[th] 26, 55 (1998)).  Whether Apple knew that iMessage disruption of text message was "certain or substantially certain to occur" is a common question subject to common proof.  It depends on a showing of what Apple knew.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████.  In any event, discerning Apple's tortious intent is not an individual question whose response will vary from individual class member to class member.  There is no plausible allegation—and Apple does not suggest—that it deployed iMessage with some malevolent intent towards particular Class members but not towards others.  Whether Apple's intent was actionable or not, therefore, is a question whose resolution is common to the Class and whose proof would predominate over any questions affecting only individual members of the Class.

### D. The Contractual Breach Poses A Common Predominating Question.

Whether iMessages actually disrupts the delivery of text messages sent from iPhones to non-Apple phones of former iPhone users is also a common question.  It turns on the inner workings of iMessage.



Even assuming *arguendo* that Apple could show that some number of Class members who switched to a non-Apple phone managed to evade any disruption of text message delivery, that would still not defeat class certification.  The law assuredly does not require a showing that all Class members were injured as a prerequisite to obtain class certification.  *See Kohen v. PIMCO*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) ("What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

-21-

inevitable" but not a basis to defeat class certification); *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013) ("*Defendants' argument on this point is essentially that the IPPs must be able to prove at the class certification stage that every single (or basically every single) class member was injured by Defendants' conduct.  This contention is wrong.*").  Moreover, as Dr. Dwyer makes clear, <u>*all*</u> Class members suffered economic impact because the price they paid for their wireless plans was set in advance before any Class member knew whether she would end up receiving any particular text messaging.  But because no Class member was advised that her text messaging capability under the plan was subject to being interfered with by Apple's conduct, all subscriber Class members paid more for their wireless plan than they would have had to pay had the iMessage bug and its likely effect been disclosed at the time of the plan's subscription.  *See* Ex. 2 to Katriel Decl., at ¶¶ 20-38.

## III.   DETERMINING ADVERSE IMPACT AND QUANTIFYING CLASSWIDE DAMAGES ARE SUBJECT TO COMMON, PREDOMINATING PROOF.

Apple's alleged tortious interference with Class members' contracts caused adverse impact that is common to the Class.  It also caused Class members to sustain economic harm or damages.  Dr. Dwyer details the adverse economic impact that was visited upon all Class members, and he also separately provides a methodology to quantify the classwide caused by Apple's conduct.  Although related, the two concepts are distinct.  The Supreme Court has explained that the required showing of the fact of damage (i.e., adverse impact) is "minimal": a plaintiff's "burden of proving the fact of damage . . . is satisfied by proof of *some damage* flowing from the unlawful conspiracy; inquiry beyond this *minimum* point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n.9 (1969) (emphasis added).  Insofar as calculating classwide damages are concerned, the California Court of Appeals and Supreme Court has consistently held that merely because quantification of damages may be imprecise or uncertain that does not serve to bar recovery after the fact of damages caused by a contractual breach is established:

> Where, as here, plaintiffs are clearly damaged by a breach of contract—they paid for advertising distribution services that they did not receive—they will not be

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

–22–

denied recovery simply because precise proof of the amount of damage is not available.

*Ammari Electronics v. Pacific Bell Directory*, 2011 WL 5547588, at *13 (2011) (citing *Cedars–Sinai Medical Center v. Superior Court* 18 Cal.4th 1, 14, n. 3 (1998)); *see also Long Beach Drug Co. v. United Drug Co.*, 13 Cal.2d 158,174 (1939) ("The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent, or difficult of ascertainment does not bar the recovery.").  The Ninth Circuit has also held that individual questions dealing with the quantification of damages are no bar to class certification.  *See Leyva v. Medline Indus.*, 716 F.3d 510, 513-14 (9th Cir. 2013) ("damages calculations alone cannot defeat class certification.").

**A.  All Class Members Were Subject To Adverse Impact.**

As Dr. Dwyer explains, *all* Class members were subject to adverse, common impact as a result of Apple's alleged conduct. *See* Ex. 2 to Katriel Decl., at ¶¶ 20-39.  This is so because the value associated with the wireless plan that consumers paid for, operating under the assumption that they would be entitled to receive text messages per the terms of their respective plan, would have been reduced had consumers known at the time they subscribed to the wireless plan that, despite being contractually permitted to receive text messages, there was a real likelihood that text messages sent to them would not be delivered due to Apple's conduct.   Clearly, a text messaging plan that had been disclosed to be unreliable in that it was subject to experiencing real disruption in delivering text message would be worth less to a consumer than a text messaging plan that did not carry that disadvantage or unreliability.  When Class members subscribed to their plans upon switching from an iPhone to a non-Apple phone, however, they were not advised that, though the wireless plan they were paying for allowed them to avail themselves of text messaging services, there was a real probability that their incoming text messages (those sent from iPhones) would be subject to not being delivered.  As Dr. Dwyer analogizes, "a consumer who knows that her water supply is potentially interruptible would be willing to pay less for that supply than for a water supply with greater reliability. This same analysis applies equally to the supply of text messaging services as it does to the supply of water." *Id.* at ¶ 21.

Pltf. Adrienne Moore's Mtn. For Class Certif.                                  *Moore v. Apple Inc.*,
                                                                                No. 5:14-cv-02269-LHK

–23–

Further, because a plan is entered into and contracted for *ex-ante*, before the Class member actually receives service, the value of a text messaging plan within a wireless agreement would have been diminished if the subscriber had been advised at that time that the carrier's ability to deliver the text messages prospectively was subject to reliability concerns (due to the iMessage bug).  As Dr. Dwyer explains:

> Because a cellular agreement provides prospective communications services, its value to the class member is diminished by the prospect that potential communications may fail or are more at risk of failing at a higher rate than would otherwise have been expected. Since this interference was not disclosed, the class member could not have incorporated it into her valuation of the WSA [wireless service agreement] she purchased. Instead, class members presumed that they were purchasing the same quality of text message delivery service as anyone else who was purchasing the same WSA, but without having previously owned an iPhone. Since Apple's iMessage service interfered with class members' ability to receive text messages, it diminished the quality of that service. To the extent that class members valued text message service – as is evidenced by the fact that they purchased devices and WSAs that provided for text messaging capabilities and that, as detailed in the following paragraphs, the overwhelming majority of them used text messaging – this interference would have reduced their willingness-to-pay for their WSAs.

*Id*. at ¶ 24.

As a matter of economic reality, common impact occurred across the Class because a "rational consumer would have reduced the amount she was willing to pay for a WSA, had she known of the interference with her text message delivery caused by Apple's iMessage service." *Id*. at ¶ 20.  As Dr. Dwyer documents, this well-recognized concept of comparing what a consumer actually paid for a service to what the consumer was willing to pay is a "well-recognized concept in economics known as consumer surplus." *Id*. and id. at ¶ 20, n.28 (citing references).[3]  Because this reduction in consumer surplus depends on the *ex ante* valuation of Class members placed on their service agreements, its calculation or ascertainment does not depend on quantifying how many text messages were missed by each Class member.  *Id*. at ¶ 37

---

[3] This same loss of value calculation between what Class members bargained for versus what they obtained is also the measure used to quantify the amount of restitution under the UCL. *See Ogden v. Bumble Bee Foods*, 2014 WL 27527, at *13 (N.D. Cal. Jan. 2, 2014) (Koh, J.,) ("claim for restitution requires that Ogden also present evidence of the difference in value between what she spent and what she received").

Pltf. Adrienne Moore's Mtn. For Class Certif.

*Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

1   ("This economic injury, in lost value of WSAs is distinct from, and in addition to, any economic

2   injury caused by the actual occurrence of undelivered communications.").

3       **B.  There Is A Methodology For Calculating Classwide Damages.**

4       After setting forth the description of the common impact sustained by the Class, Dr.

5   Dwyer goes on to proffer and utilize a method of calculating classwide damages to quantify this

6   impact.  *See id*. at ¶¶ 39-65.  He first ascertained the likely size of the class based on data about

7   switchers from iPhones to non-Apple phones. *Id*. at ¶¶ 43-45. He next calculated the valuation of

8   consumer's willingness to pay for text-messages based on extensive historical review of the

9   pricing and corresponding supply of text messaging, which allowed Dr. Dwyer to ascertain the

10  elasticity of demand for text message services. *Id*. at ¶¶ 46-60.  Based on the proportion of

11  iPhones to non-Apple phones and what is now known about the extent of iMessage disruption of

12  text messages sent from iPhones to non-Apple phones of former iPhone users, he calculated the

13  probability that a set number of incoming messages will not be delivered to a Class member due

14  to the iMessage's bug.  *Id*. at ¶¶ 61-62.  Applying the valuation of the text messaging to this

15  probability, Dr. Dwyer is calculated the reduction in consumer surplus (i.e., the diminution in

16  consumer surplus attributable to the likelihood that text messages will not be delivered to a Class

17  member).   He tested this methodology by applying it in preliminary fashion based on the

18  discovery that is available to date through the period October 2014.  For that period, Dr. Dwyer

19  calculated that the Class sustained damages of about $47.1 million. *Id*. at ¶ 64.

20  **IV.   <u>THE CLASS IS ASCERTAINABLE.</u>**

21      The Class is ascertainable.  It comprises all persons in the U.S. who owned an iPhone

22  with iOS 5 or later and switched to a non-Apple phone while keeping their wireless number—

23  something that can be verified by carriers' records.  The Class is "defined by 'objective criteria'

24  and . . . it is 'administratively feasible' to determine whether a particular individual is a member."

25  *Bruton v. Gerber Prods.*, 2014 WL 2860995, at *4 (N.D. Cal. Jun. 23, 2014) (Koh, J.,).

26                          <u>**CONCLUSION**</u>

27      For the foregoing reasons, Plaintiff's motion should be GRANTED.

Pltf. Adrienne Moore's Mtn. For Class Certif.                              *Moore v. Apple Inc.*,
28                                                                      No. 5:14-cv-02269-LHK

Dated: May 14, 2015                         /s/ *Roy A. Katriel*
                                          _____

Roy A. Katriel (SBN 265463)
THE KATRIEL LAW FIRM
4225 Executive Square, Suite 600
La Jolla, California 92037
Telephone: (858) 242-5642
Facsimile:  (858) 430-3719
e-mail: rak@katriellaw.com

Ralph B. Kalfayan, (SBN 133464)
Lynne M. Brennan (SBN 149131)
KRAUSE, KALFAYAN, BENINK &
SLAVENS, LLP
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  (619) 232-0331
Facsimile:  (619) 232-4019
e-mail: ralph@kkbs-law.com
           lbrennan@kkbs-law.com

*Counsel for Plaintiff and the Proposed Class*

Pltf. Adrienne Moore's Mtn. For Class Certif.                    *Moore v. Apple Inc.*,
No. 5:14-cv-02269-LHK

–26–