United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ADRIENNE MOORE,

          Plaintiff,

    v.

APPLE INC.,

          Defendant.

Case No.14-CV-02269-LHK

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Before the Court is Plaintiff Adrienne Moore's motion for class certification. ECF No. 57. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby DENIES Plaintiff's motion for class certification.

## I.      BACKGROUND

### A.  Factual Allegations

Defendant Apple, Inc., a California corporation headquartered in Cupertino, California is "one of the world's largest and most popular maker of . . . wireless devices, such as the various versions of the iPhone and iPad." Compl. ¶ 6. Apple's wireless devices work on Apple's software operating system, commonly known as "iOS." *Id.* Apple released iOS 5 in October 2011 and introduced its "iMessage service and Messages client application" as part of iOS 5. *Id.* Plaintiff

Adrienne Moore is a resident of California. *Id.* ¶ 5. In March 2011, Plaintiff purchased an iPhone 4. *See* Declaration of Jeffrey Kohlman in support of Apple's Motion to Dismiss, ECF No. 18; Compl. ¶ 5. Plaintiff subscribed to Verizon Wireless for her wireless service needs. Compl. ¶ 5. At some point after iOS 5's release in October 2011, but before April 16, 2014, Plaintiff updated her iPhone 4 to iOS 5, which included iMessage and Messages. *Id.* After updating her iOS, Plaintiff's iPhone 4 "began using by default the iMessage service to route text messages from and to her through Apple's Messages application" when the messages involved other Apple devices running iOS 5 or later. *Id.* On or about April 16, 2014, Plaintiff replaced her iPhone 4 with a Samsung Galaxy S5. *Id.* As a result of that switch, Plaintiff alleges that she has failed to receive "countless" text messages sent to her from Apple device users. *Id.*

Plaintiff alleges that Apple failed to disclose that use of iMessage and Messages would result in undelivered messages if an iPhone user switched to a non-Apple device. More specifically, Plaintiff alleges that Apple knowingly omitted material information about the Messages application's inability to detect when a former Messages user switches to a non-Apple device, resulting in undelivered text messages. Apple's actions allegedly tortiously interfered with Plaintiff's contract with Verizon Wireless because Plaintiff was entitled to send and receive text messages under her wireless service contract and Apple's actions deprived her of the benefit of receiving text messages from Apple device users.

### 1.  Text Messages, iMessage, and Messages

Text messaging, or "texting," is the act of sending or receiving "brief, electronic message[s] between two or more mobile phones, or fixed or portable devices over a phone network." Compl. ¶ 7. Text messaging is the "most widely used mobile data service." *Id.* Texting originally only referred to messages sent using the Short Messages Service ("SMS"), but now also encompasses messages containing media such as pictures, videos, and sounds ("MMS"). *Id.* When using SMS to send a text message, the message is transmitted in SMS form to an "SMS Center," where it is then routed to a transmission tower operated by the service network. *Id.* The transmission tower then sends the message to the recipient's wireless device through the device's

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

control channel. *Id.* Once a message is received, the device notifies the recipient of receipt. *Id.* This process is the same for MMS messages. *Id.* In light of text messaging's popularity with users, the major cellular service networks, including Verizon Wireless, provide their users with the ability to send and receive text messages in this fashion. *Id.* ¶¶ 9–10.

Apple wireless devices are capable of sending SMS and MMS messages as described above, but Apple also provides iMessage, a "messenger service," that uses data networks such as Wi-Fi, 2G, 3G, and LTE networks to send text messages, pictures, video, audio, documents, contact information, and group messages to other Apple devices with the Messages application. *Id.* ¶ 5. Rather than incurring an SMS charge to send a text message, iMessage text messages are "treated as . . . additional data transfer[s]." *Id.* ¶ 12. An Apple device user with iOS 5 or higher sending a text message to another Apple device equipped with iOS 5 or higher will automatically use Apple's Messages application to send text and media iMessages rather than using SMS. *Id.* ¶ 11.

### 2. Plaintiff's Experiences

On or about April 16, 2014, Plaintiff replaced her iPhone 4 with a Samsung Galaxy S5. *Id.* Plaintiff retained her same cellular telephone number and continued to subscribe to Verizon Wireless. *Id.* The non-Apple device did not have Messages and could not send or receive iMessages. *Id.* ¶¶ 13–16. "Shortly after" Plaintiff switched to the Samsung device, Plaintiff noticed she was not receiving text messages she expected to receive from users of Apple devices. *Id.* ¶ 18. After this initial discovery, Plaintiff contacted her service provider, Verizon Wireless, which informed her that she needed to "turn off" Messages on her old iPhone. *Id.* ¶ 19. After doing so, Plaintiff began to receive text messages from some Apple device users, but not from others. *Id.* Plaintiff again contacted Verizon Wireless and was told that this "had been an issue when people switch from an Apple . . . device to a non-Apple phone," and after attempting additional trouble shooting, Plaintiff was referred to Apple for further assistance. *Id.* ¶ 20.

Plaintiff alleges that the Apple representative informed her that some Apple device users might not be using the latest iOS, which would result in Plaintiff not receiving their text messages.

3

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

*Id.* ¶ 21. The Apple representative then suggested that Plaintiff have the text message senders update to the latest iOS, delete and then re-add Plaintiff as a contact, or start a new text message "conversation" between Plaintiff and the Apple user. *Id.* Plaintiff attempted some of these proposals, but they were unsuccessful. *Id.* ¶ 22. Plaintiff also contends these solutions do not address the threshold issue that Plaintiff is unable to discern which of her contacts are using Messages to contact her because she is not receiving their messages. *Id.*

Plaintiff is not the only former Apple device user to encounter the problem of undelivered text messages. *Id.* ¶¶ 24–25. "[C]ountless" former Apple device users have not received messages sent by Apple device users. *Id.* Plaintiff cites a Business Insider article discussing an Apple employee's apparent admission that "'a lot' of users have this problem: If you switch from an iPhone to an Android, iMessage won't deliver texts from iPhone users to your new Android phone." *Id.* ¶ 26; Compl. Exh. 1. Plaintiff further alleges that Apple's Help Page on its website provides misleading information regarding how to prevent the "undelivered messages" problem. Compl. ¶ 27. The Help Page instructs users to turn off iMessage on their old iPhones because "[i]f you don't, other iOS devices might continue to try to send you messages using iMessage, instead of using SMS or MMS, for up to 45 days." Compl. Exh. 2. Despite following this instruction, Plaintiff continued to not receive messages from Apple users. Compl. ¶ 27. Plaintiff alleges that had Apple informed her that iMessage would prevent her from receiving text messages if she switched to a non-Apple device, she "would not have downloaded the iMessage and Messages service and application, or would not have purchased an iPhone or other Apple device in the first instance." *Id.*

### 3. Apple's Response

Plaintiff contends that Apple was aware of the iMessages problem as early as January 2012 based on internal Apple emails discussing a January 12, 2012 news article regarding the iMessage "bug," and possible causes for the issue. *See* Katriel Decl. Exhs. 4, 5. Plaintiff further contends that the "problem pervades to this day." Mot. at 3. Plaintiff cites internal emails from Google, Inc., from early 2015 indicating that the iMessage problem was not only persisting, but that the

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

"iMessage deregistration tool doesn't work." Katriel Decl. Exh. 8. Wireless service providers, including AT&T, Verizon, Sprint, and T-Mobile, also documented the iMessage problem for former iPhone users who had switched to non-Apple devices. *See* Katriel Decl. Exh. 9 (AT&T document); Exh. 19 (Apple email discussing Verizon and AT&T users); Exh. 20 (email from T-Mobile to Apple); Exh. 21 (Apple email discussing Sprint). Internal AT&T documents indicate that former iPhone users' inability to receive text messages from iPhone users was a major driver of calls to AT&T's customer service call center. *Id.* at ATT000332. These internal documents appear to indicate that disruptions in text message delivery could occur regardless of whether or not former iPhone users complied with Apple's recommended deregistration process. *See id.*; Exh. 8 (Google email). When asked if the iMessage issue was specific to any particular wireless carrier or to a specific non-Apple device, Apple's corporate representative responded "Not that I'm aware of." *Id.* Exh. 17 at 30:9–23.

In addition to these third-party documents describing the scope of the iMessage problem, Plaintiff also points to Apple's own internal documents apparently discussing how Apple's "so-called fixes" failed to address the disruptions in text message delivery. More specifically, Plaintiff cites internal Apple emails from May 2014 explaining that "[e]ven when we unregister you, the client doesn't care. . . . [E]ven if you do everything right, all of your friends have a client that never does another lookup." Katriel Decl. Exh. 13 at APL-Backhaut_00031354. Other internal Apple emails note that hundreds of former iPhone users reported attempting de-activation but were still not receiving text messages from Apple device users. *See id.* at APL-Backhaut_00031355. Plaintiff also cites an outside email from AT&T to Apple regarding the "growing nature of the problem" and the "growing duration of text message disruption periods that users" were experiencing. Mot. at 7 (citing Katriel Decl. Exh. 13 at APL-Backhaut_00031356). According to Plaintiff, it was only after these discussions that Apple provided a public disclosure on its website that failure to turn off iMessage before switching from an Apple to a non-Apple device "might" result in Apple devices "continu[ing] to try to send you messages using iMessage, instead of SMS or MMS, for up to 45 days." Katriel Decl. Exh. 14.

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

**B. Procedural History**

Plaintiff filed this putative class action Complaint on May 15, 2014. ECF No. 1. Defendant filed its motion to dismiss on July 24, 2014. ECF No. 18. Plaintiff filed her opposition on August 21, 2014. ECF No. 22. Plaintiff further filed a request for judicial notice on August 22, 2014, which Defendant did not oppose. ECF No. 23. Defendant filed its reply on September 18, 2014. ECF No. 24. On November 10, 2014, the Court granted in part and denied in part Defendant's motion to dismiss. ECF No. 29. The Court granted with prejudice Defendant's motion to dismiss Plaintiff's CLRA claim and UCL claim predicated on the CLRA claim, as well as Plaintiff's UCL claim based on unfair business practices. *Id.* at 17. The Court denied Defendant's motion to dismiss Plaintiff's tortious interference with contract claim and UCL claim predicated on the tortious interference claim. *Id.*

Defendant filed its answer to Plaintiff's surviving tortious interference with contract claim and UCL claim predicated on the tortious interference claim on November 24, 2014. ECF No. 37.

On May 14, 2015, Plaintiff filed the instant motion for class certification.[1] ECF No. 55. Defendant filed an opposition on June 12, 2015. ECF No. 79 ("Opp."). Plaintiff filed a reply on July 3, 2015. ECF No. 91. On July 17, 2015, Defendant filed a motion for leave to file surreply. ECF No. 97. On July 21, 2015, Plaintiff filed a response opposing Defendant's motion, and requested in the alternative that the Court grant Plaintiff leave to file a sur-sureply. ECF No. 101. The Court grants Defendant's motion for leave to file surreply and Plaintiff's motion to file a sur-sureply.

On June 25, 2015, Defendant filed a motion for summary judgment. ECF No. 87. On July 1, 2015, Defendant filed a motion to shorten time on its motion for summary judgment, ECF No. 90, which Plaintiff opposed on July 5, 2015, ECF No. 93. The Court denied Defendant's motion to shorten time on its motion for summary judgment on July 7, 2015. ECF No. 94. Defendant's motion for summary judgment remains set for hearing on October 15, 2015.

---

[1] The parties filed a variety of motions to seal *see* ECF Nos. 55, 56, 77, 80, 82, 91, 92, which the Court addressed in a separate order, ECF No. 112.

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

### C. Class Definition

Plaintiff moves to certify the following class:

> All persons within the United States who, during the time period October 12, 2011 to the present, switched their wireless telephone account by porting their cellular telephone number from an Apple iPhone device that was operated by iOS version 5 or later to a non-Apple cellular telephone.

Mot. at 1. Plaintiff seeks to certify a damages class pursuant to Federal Rule of Civil Procedure 23(b)(3).

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 23, which governs class certification, has two sets of distinct requirements that Plaintiff must meet before the Court may certify a class. Plaintiff must meet all of the requirements of Rule 23(a) and must satisfy at least one of the prongs of Rule 23(b).

Under Rule 23(a), the Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Courts refer to these four requirements, which must be satisfied to maintain a class action, as "numerosity, commonality, typicality and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

In addition to meeting the requirements of Rule 23(a), the Court must also find that Plaintiff has satisfied "through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The Court can certify a Rule 23(b)(3) class if the Court finds that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Further, courts have implied an additional requirement under Rule 23 where a plaintiff seeks to certify a Rule 23(b)(3) class: that the class to be certified be ascertainable. *See*

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1   *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012); *Herrera v. LCS*

2   *Fin. Servs. Corp.*, 274 F.R.D. 666, 671–72 (N.D. Cal. 2011); *see also In re Yahoo Mail Litig.*, No.

3   13-CV-4980-LHK, 2015 WL 3523908, at *15–17 (N.D. Cal. May 26, 2015) (finding that

4   ascertainability requirement applies only to damages classes under Rule 23(b)(3)).

5          "[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap

6   with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Trust*

7   *Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

8   2551 (2011)); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must

9   conduct a 'rigorous analysis' to determine whether the party seeking certification has met the

10  prerequisites of Rule 23.'" (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186,

11  *amended by* 273 F.3d 1266 (9th Cir. 2001))). Nevertheless, "Rule 23 grants courts no license to

12  engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95.

13  "Merits questions may be considered to the extent—but only to the extent—that they are relevant

14  to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

15  Within the framework of Rule 23, the Court ultimately has broad discretion over whether to certify

16  a class. *Zinser*, 253 F.3d at 1186.

## III.   DISCUSSION

18         Plaintiff moves to certify a nationwide damages class of former iPhone users pursuant to

19  Federal Rule of Civil Procedure 23(b)(3). The Court addresses Plaintiff's standing to sue before

20  turning to the requirements of Rule 23(a) and Rule 23(b).

### A.   Article III Standing

22         "In a class action, standing is satisfied if at least one of named plaintiff[s] meets the

23  requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citing

24  *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)). Not only must at least one named plaintiff

25  satisfy constitutional standing requirements, but the plaintiff "bears the burden of showing that he

26  [or she] has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488,

27  493 (2009). Article III standing to sue requires that a plaintiff show "(1) an injury-in-fact that is

28

United States District Court
Northern District of California

8

United States District Court
Northern District of California

concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury is redressable by a favorable ruling." *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120, 1128 (N.D. Cal. 2014) (citing *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because the elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.*; *see also In re iPhone Application Litig.*, No. 11-2250, 2013 WL 6212591 (N.D. Cal. Nov. 25, 2013).

On a motion for class certification, this means Plaintiff must show standing "through evidentiary proof." *Comcast*, 133 S. Ct. at 1432; *see also Evans v. Linden Research, Inc.*, No. 11-1078, 2012 WL 5877579, at *6 (N.D. Cal. Nov. 20, 2012) (At class certification, "Plaintiffs must demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III standing to bring the claims asserted on behalf of the [class].*"); *Nelsen v. King Cnty.*, 895 F.2d 1248, 1249–50 (9th Cir.1990) ("Standing is a jurisdictional element that must be satisfied prior to class certification."); *In re First Am. Corp. ERISA Litig.*, No. 07-1357, 2009 WL 928294 (C.D. Cal. Apr. 2, 2009) ("[A]t the class certification stage, . . . unlike on a motion to dismiss, the would-be class representative must show standing, rather than merely allege it."); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. 04-1511, 2007 WL 1689899 (N.D. Cal. June 11, 2007) ("[I]t is 'well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.'" (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1287–88 (11th Cir. 2001)); *cf. Baghdasarian v. Amazon.com, Inc.*, No. 05-8060, 2009 WL 4823368 (C.D. Cal. Dec. 9, 2009) *aff'd*, 458 F. App'x 622 (9th Cir. 2011) ("At the class certification stage, Plaintiff must make

9

1   certain allegations concerning standing. . . . [At] summary judgment, Plaintiff must establish

2   certain facts.").

3       Here, Defendant contends that Plaintiff has failed to offer "evidentiary proof" showing that

4   Plaintiff has suffered an injury-in-fact that is fairly traceable to Defendant. More specifically,

5   Defendant contends that Plaintiff has put forth no evidence that Plaintiff failed to receive any text

6   messages, that any undelivered text messages were sent via iMessage, or that iMessage caused any

7   alleged nondelivery. Opp. at 7.

8       However, the Court finds that Plaintiff has put forth evidence of injury-in-fact. More

9   specifically, Plaintiff has submitted exhibits and responses to interrogatories indicating that

10  current Apple device users using iMessage sent Plaintiff text messages that Plaintiff did not

11  receive on her non-Apple device. For instance, Plaintiff has submitted a screenshot showing that

12  she failed to receive a text message sent by an individual who apparently was using an Apple

13  device at the time. *See* Katriel Reply Decl. Exh. 8. Moreover, in response to Apple's

14  interrogatories, Plaintiff also identified messages from her supervisor that were apparently sent

15  from an iPhone but not received on Plaintiff's non-Apple device. *See* Katriel Decl. Exh 29.

16  Plaintiff further provided emails between herself and her supervisor substantiating Plaintiff's

17  interrogatory response. *See* Katriel Reply Decl. Exh. 7. Plaintiff has therefore done more than

18  merely allege injury-in-fact, she has provided evidentiary proof of her injury. *See Comcast*, 133 S.

19  Ct. at 1432; *Evans*, 2012 WL 5877579, at *6.

20      As to causation, the Court finds that Plaintiff has sufficiently put forth evidentiary support

21  that her undelivered text messages are fairly traceable to Defendant's alleged wrongful conduct.

22  Here, Defendant contends that Plaintiff can only speculate that Defendant's iMessage system

23  caused Plaintiff's injury, as opposed to some other cause. However, for Article III standing

24  purposes, a "causal chain does not fail simply because it has several links, provided those links are

25  not hypothetical or tenuous and remain plausible." *Wash. Env'tl. Council v. Bellon*, 732 F.3d

26  1131, 1141–42 (9th Cir. 2013). Nor does standing require the defendant's action to be the "sole

27  source" of injury. *See Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011) (holding that

28

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

a plaintiff "need not eliminate any other contributing causes to establish its standing"). While Defendant may challenge, on the merits, whether Plaintiff can prove the level of causation required for her tortious interference with contract claim, in order to satisfy Article III's standing requirement, Plaintiff does not need to prove at this stage that iMessage is the "sole source" of her injury. *See id.*

Here, as discussed in the factual background, Plaintiff has submitted evidence that iMessage apparently caused former iPhone users to not receive text messages sent from Apple device users. *See* Katriel Decl. Exh. 8 (internal Google email regarding iMessage issue); Exh. 9 (AT&T document); Exh. 19 (Apple email discussing Verizon and AT&T users); Exh. 20 (email from T-Mobile to Apple); Exh. 21 (Apple email discussing Sprint). There is no dispute that Plaintiff has put forth evidence that she is a former iPhone user. Moreover, Plaintiff attempted to troubleshoot the problem, and has submitted proof that she contacted Defendant and her wireless service provider. Plaintiff further avers that she attempted the various "fixes" provided by Defendant's customer service representatives to no avail. *See* Katriel Decl. Exhs. 31, 32. Based on this evidence, the Court finds that Plaintiff has both alleged and shown that there is a causal connection between her injury, undelivered text messages, and Defendant's iMessage service.

In sum, the Court finds that Plaintiff has satisfied the standing requirements under Article III.

## B. Class Members' Article III Standing and Rule 23

In addition to challenging whether Plaintiff has satisfied her burden of showing Article III standing, Defendant further contends that the proposed class includes members who lack standing. More specifically, Defendant argues that Plaintiff's proposed class definition includes individuals who have suffered no actual injury. Defendant contends that the inclusion of proposed class members that lack Article III standing defeats class certification under the Ninth Circuit's decision in *Mazza*.

As a threshold matter, the Court notes that neither party directly addresses whether Defendant's argument with respect to the putative absent class members' standing is a

11

United States District Court
Northern District of California

jurisdictional argument under Article III or an argument against certification under Federal Rule of Civil Procedure 23. The Court acknowledges, as have many other district courts in this Circuit, that the Ninth Circuit's decision in *Mazza* appears to be in tension with prior Ninth Circuit authority. *See, e.g.*, *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 475–480 (S.D. Cal. 2013) (collecting district court cases addressing this apparent contradiction and citing *Walker v. Life Ins. Co. of the Sw.*, No. 10-9198, 2012 WL 7170602 (C.D. Cal. Nov. 9, 2012); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 474–75 (C.D. Cal. 2012); *Tietsworth v. Sears, Roebuck and Co.*, No. 09-00288, 2012 WL 1595112, at *14 (N.D. Cal. May 4, 2012); *Baxter v. Rodale*, No. 12-00585, 2012 WL 1267880, at *2 (C.D. Cal. Apr. 12, 2012); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 WL 253298, at *1 n.2 (N.D. Cal. Jan. 26, 2012); *Ries v. Az. Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012); *Arnott v. United States Citizenship and Immigration Servs.*, 290 F.R.D. 579, 584 (C.D. Cal. 2012)).

At the heart of this dispute is a single sentence from the Ninth Circuit's decision in *Mazza*: "[N]o class may be certified that contains members lacking Article III standing." 666 F.3d at 594 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). This statement, on its face, appears to contradict the Ninth Circuit's prior decisions in *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), and *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) (en banc). In *Bates*, an en banc panel of the Ninth Circuit held that "[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements . . . . Thus, we consider only whether at least one named plaintiff satisfies the standing requirements . . . ." 511 F.3d at 985. Similarly, in *Stearns*, the Ninth Circuit relied on *Bates* to hold that standing under Article III was satisfied so long as "one named plaintiff satisfies the standing requirements." 655 F.3d at 1020–21 (quoting *Bates*, 511 F.3d at 985). Courts have found that the *Bates* and *Stearns* courts' holdings that a single named plaintiff's standing can satisfy Article III standing for the class is at odds with a reading of *Mazza* that requires even absent class members to demonstrate Article III standing for jurisdictional purposes. *See, e.g.*, *Waller*, 295 F.R.D. at 475–480 (discussing cases).

To the extent Defendant relies on *Mazza*'s statement as overruling the Ninth Circuit's prior

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1  decisions in *Bates* and *Stearns*, the Court concludes that Defendant's interpretation of *Mazza* is

2  incorrect. The *Mazza* court cited both *Bates* and *Stearns* and relied on those cases to conclude that

3  class members had suffered an injury-in-fact. *See* 666 F3d. at 594–95. As the leading treatise on

4  class actions describes it, the quoted language in *Mazza*, originally stated in the Second Circuit's

5  decision in *Denney*, reflects a concern "about whether the class is properly defined, as the issue

6  tends to arise in the context of class certification, not jurisdiction. In this sense, the problem of un-

7  injured absent class members is a problem of Rule 23, not of Article III." Newberg on Class

8  Actions § 2.3. In other words, under *Bates* and *Stearns*, at least one named plaintiff must satisfy

9  Article III standing requirements for jurisdictional purposes, but whether or not the proposed class

10  includes class members who have not suffered an injury is a Rule 23 question. *See Bruno v. Quten*

11  *Research Inst., LLC*, 280 F.R.D. 524 (C.D. Cal. 2011) (discussing cases and rejecting argument

12  that *Mazza* imposes a jurisdictional requirement as to unnamed class members).

13        Accordingly, the Court turns to whether Plaintiff's class definition is overbroad under

14  *Mazza* and Rule 23. Here, Apple contends that there are three groups of proposed class members

15  who suffered no injury: (1) persons who experienced no disruption in their text message services;

16  (2) persons who failed to receive text messages because of technical issues unrelated to the

17  iMessages system; and (3) persons who failed to receive text messages because of restrictions in

18  their wireless contracts. Opp. at 9–10. As discussed above, the Court concludes that Defendant's

19  argument goes to the propriety of certification under Rule 23, not jurisdiction. The Court therefore

20  addresses whether Plaintiff's proposed class definition of "[a]ll persons within the United States

21  who, during the time period October 12, 2011 to the present, switched their wireless telephone

22  account by porting their cellular telephone number from an Apple iPhone device that was operated

23  by iOS version 5 or later to a non-Apple cellular telephone," is overbroad under Rule 23 because it

24  contains members who lack Article III standing. *See Mazza*, 666 F.3d at 594.

25        As a threshold matter, the Court agrees with Defendant that Plaintiff's proposed class

26  includes individuals who, by definition, *could not* have been injured by Defendant's alleged

27  wrongful conduct. While many wireless service agreements may include the contractual right to

28

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1    send and receive text messages, Plaintiff does not and cannot contend that every proposed class

2    member's wireless service agreement included the right to receive text messages. *See* Mot. at 18

3    (arguing that "virtually all" agreements include texting). As Defendant puts it, "Apple cannot

4    interfere with contractual rights these putative class members never had." Opp. at 13. Unlike

5    proposed class members who, by happenstance, *may* not have experienced disruption of text

6    message services due to Defendant's alleged wrongful conduct, proposed class members who did

7    not have a contractual right to receive messages at all *could* not have been injured. Under *Mazza*,

8    such a class cannot be certified. *See* 666 F.3d at 594; *see also Kohen v. Pac. Inv. Mgmt. Co., LLC*,

9    571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the [class] definition is so broad that it sweeps within it

10   persons who could not have been injured by the defendant's conduct, it is too broad."); *Messner v.*

11   *Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) (same).

12           Furthermore, the inclusion of class members whom, by definition, could not have been

13   injured is not only problematic because it demonstrates the overbreadth of the proposed class, it is

14   also indicative of the individualized inquiries that would be necessary to determine whether a class

15   member has suffered any injury in the first place. In response, Plaintiff contends that all class

16   members were injured and "commonly impacted" because "all paid for a wireless service

17   agreement text messaging feature, and yet all were subject to having their text messaging

18   disrupted due to Apple's iMessage flaw." Reply at 6. However, Plaintiff's argument rests on two

19   erroneous assumptions: (1) that all class members actually paid or contracted for text messaging

20   services; and (2) that all class members actually experienced a disruption in text messaging

21   services due to iMessage. As discussed above, Plaintiff's proposed class necessarily includes

22   individuals who did not pay or contract for text messaging services. Indeed, Plaintiff's own

23   evidence indicates that there are material variations in wireless service agreements, such that a

24   proposed class member could have unlimited, limited, or no right to text messages at all. *See infra*

25   Part C.2. Moreover, as the Court discusses in depth below, the question of whether an individual

26   class member actually experienced a disruption in text messaging services, and whether that

27   disruption was caused by iMessage is not subject to common proof and will require individual

28

United States District Court
Northern District of California

inquiries.

In sum, the Court finds that Plaintiff's proposed class is overbroad and cannot be certified under *Mazza* because it necessarily includes individuals who could not have been injured by Defendant's alleged wrongful conduct as a matter of law. *See Mazza*, 666 F.3d at 594. As the overbreadth of Plaintiff's proposed class is intertwined with additional, related Rule 23 predominance issues, the Court also addresses the other predominance problems that make class treatment inappropriate in the instant case.

**C. Rule 23 Requirements**

Plaintiff moves to certify her proposed class as a Rule 23(b)(3) damages class. As discussed above, the Court finds that Plaintiff's proposed class is overbroad and that certification would be inappropriate under the Ninth Circuit's decision in *Mazza*. Moreover, for the reasons discussed below, the Court finds that class certification would be inappropriate because additional individual issues predominate over any common questions of law or fact. In addition to the inclusion of individuals who could not have suffered any injury as a matter of law, the Court concludes that the individualized inquiries necessary to determine whether an individual has, in fact, suffered an injury defeats predominance. The Court begins with the legal standard for predominance before addressing the individualized issues that defeat predominance in the instant case.

**1.    Predominance**

The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Accordingly, the predominance analysis "focuses on the relationship between the common and individual issues in the case." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (internal quotation marks omitted); *see also In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) ("Whether judicial economy will be served in a particular case turns on close scrutiny of the relationship between the common and individual issues." (internal quotation marks omitted)).

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    Undertaking the predominance analysis requires some inquiry into the merits, as the Court

2    must consider "how a trial on the merits would be conducted if a class were certified." *Gene And*

3    *Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008); *see also Zinser*, 253 F.3d at 1190

4    (noting that district courts must consider as part of the predominance analysis whether a

5    manageable class adjudication can be conducted). Though the Court needs to consider the merits

6    to determine whether the action can be litigated on a class-wide basis, the Supreme Court has

7    cautioned that class certification is not an opportunity for the Court to undertake plenary merits

8    inquiries. As the Supreme Court has stated, "[m]erits questions may be considered to the extent—

9    but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for

10    class certification are satisfied." *Amgen Inc.*, 133 S. Ct. at 1195; *see also In re Whirlpool Corp.*

11    *Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (noting that merits

12    inquiries at the class certification stage are limited to those necessary to resolving the question

13    presented by Rule 23).

14    The Court's predominance analysis "entails identifying the substantive issues that will

15    control the outcome, assessing which issues will predominate, and then determining whether the

16    issues are common to the class, a process that ultimately prevents the class from degenerating into

17    a series of individual trials." *Gene And Gene LLC*, 541 F.3d at 326; *see also In re New Motor*

18    *Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008) ("Under the predominance

19    inquiry, a district court must formulate some prediction as to how specific issues will play out in

20    order to determine whether common or individual issues predominate in a given case." (internal

21    quotation marks omitted)); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)

22    (finding predominance "[w]hen common questions present a significant aspect of the case and

23    they can be resolved for all members of the class in a single adjudication"). To meet the

24    predominance requirement, "common questions must be a significant aspect of the case that can

25    be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA,*

26    *Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation marks and alterations omitted).

27    Importantly, the predominance inquiry is a pragmatic one, in which the Court does more

28    

16

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

than just count up common issues and individual issues. Wright & Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2005) (noting that "the proper standard under Rule 23(b)(3) is a pragmatic one, which is in keeping with the basic objectives of the Rule 23(b)(3) class action"). As the Seventh Circuit recently stated, "predominance requires a qualitative assessment too; it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). The Court's inquiry is not whether common questions predominate with respect to individual elements or affirmative defenses; rather, the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate. *Amgen*, 133 S. Ct. at 1196.

### B.      Application of the Predominance Standard

Here, Plaintiff has alleged two claims against Defendant: tortious interference with contract and a derivative UCL claim. Under California law, a claim for tortious interference with contract requires "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 979 (N.D. Cal. 2013) (quoting *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 530 (Cal. 1998)).

In support of her motion for class certification, Plaintiff identifies the following substantive issues as raising common, predominating questions: (1) class members' contractual right to receive text messages; (2) Defendant's knowledge of the contractual relationship between class members and their wireless service providers; (3) Defendant's intent; (4) and the factual question of whether Defendant's iMessage system "actually disrupts the delivery of text messages sent from iPhones to non-Apple phones of former iPhone users." Mot. at 21. Defendant challenges whether these issues actually do generate "common answers" as required to satisfy the commonality requirement under Rule 23(a), and, relatedly, whether individual issues predominate over any common issues.

United States District Court
Northern District of California

### a.   Material Variations in Contract Terms and Actual Breach or Interference

First, the Court finds that Plaintiff has failed to carry her burden of persuasion with respect to establishing that class members' contractual right to receive text messages will actually generate common answers and that individual issues will not predominate. *See Comcast*, 133 S. Ct. at 1432. As discussed above, Plaintiff cannot dispute that her proposed definition includes individuals who did not have any contractual right to receive text messages. Plaintiff relies on her damages expert's report for the proposition that "[t]he availability of text messaging is common across all major U.S. wireless carriers."[2] Dwyer Decl. ¶ 4. Plaintiff also cites Defendant's expert's deposition testimony in support of her claim that "virtually all" wireless service agreements provide for text messaging capability, and that the "overwhelming majority" provide for unlimited text messaging. *See* Reply at 5 (citing Katriel Decl. Exh. 6, at 53:17–24). On their face, these statements do not establish that all proposed class members actually have a contractual right to receive text messages. As another district court noted in rejecting an argument that "nearly all" proposed class members could have suffered an injury, "[s]uch equivocation . . . is itself testament to the individualized inquiry facing the Court." *O'Shea v. Epson Am., Inc.*, No. 09-8063, 2011 WL 4352458, at *12 (C.D. Cal. Sept. 19, 2011). Importantly, this distinction is not about degree of injury, but rather whether a proposed class member has suffered any cognizable injury in the first instance.

Not only are there proposed class members who did not actually pay or contract for the right to receive text messages, there are variations in the wireless service agreements that govern the receipt of text messages. Even Plaintiff's own expert concedes that some wireless service agreements involve a fixed price for unlimited service, others provide service "up to an agreed maximum of service consumed," and still others provide for separate billing with respect to each incoming or outgoing text message. *See* Dwyer Decl. ¶ 22. These variations are relevant, as

---

[2] Plaintiff neglects to mention that Plaintiff's damages expert "take[s] as a given that Apple tortiously interfered with the agreements between class members and their wireless service provide[r]s," and that each "class member was purchasing text delivery services." Dwyer Decl. ¶ 4, pg. 2, n.2.

18

restrictions in a wireless service contract could mean that an individual did not receive text messages because he or she had exceeded the maximum number of text messages paid for, or had affirmatively opted not to receive text messages either by "blocking" a particular sender or by declining to pay for text messaging services. *See* Opp. at 10; *see also* Katriel Decl. Exh. 36 (T-Mobile webpage referencing "Message Blocking"). A proposed class member thus could have experienced (or not experienced at all) a disruption in text messages because of the particular terms of his or her individual wireless service agreement. In order to determine the fact of injury, the Court would therefore have to evaluate each individual's wireless service agreement. Where determining the fact of injury would require examining each individual class member's contract, other courts have also concluded that "legal and factual questions common to the class, significant as they may be," are insufficient to overcome the individualized inquiries necessary to determine liability. *Gibson*, 2013 WL 5375648, at *13; *see also Martinez v. Welk Grp., Inc.*, No. 09-cv-2883-AJB, 2012 WL 2888536, at *4 (S.D. Cal. July 13, 2012) (predominance requirement not satisfied where "not all [proposed class members] have the same contract").

Plaintiff contends that such individualized inquiry would be unnecessary, based on the wireless "carriers' own documentation." Mot. at 18. Plaintiff has submitted webpages from Verizon, AT&T, and T-Mobile that appear to answer "Frequently Asked Questions" regarding text messaging. *See* Katriel Decl. Exhs. 35 (Verizon); 36 (T-Mobile); 37 (AT&T). According to Plaintiff, "proving whether Class members' wireless plans granted them a right to obtain text messaging is a question that can be addressed by common evidence obtained from the carriers, without the need to read through every individual Class members' wireless plan." The very evidence that Plaintiff has submitted from these wireless carriers, however, supports the opposite conclusion. For example, Plaintiff quotes language from the Verizon webpage which states "Text messaging is automatically included with the wireless services." *See* Mot. at 18; Katriel Decl. Exh. 35. Plaintiff neglects to quote the immediately following language which provides: "If you have The MORE Everything Plan, you get unlimited . . . text . . . messaging with the price of the plan. *For plans that don't include a text messaging allowance*, you can pay for text messaging on a pay

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

as you go basis." Katriel Decl. Exh. 35 (emphasis added). Similarly, the T-Mobile document that

Plaintiff relies on also alludes to plans which "may include a monthly allotment of messages," in

addition to the "unlimited" language that Plaintiff quotes. Katriel Decl. Exh. 26. These documents

show that while some proposed class members may, in fact, have unlimited text messaging

included as part of their wireless service agreements, an unknown number of others may not have

any text messaging services included in their plans, or a limited text messaging option.[3]

Contrary to Plaintiff's contention, the Court could therefore not determine on a classwide

or even carrier-wide basis whether individual class members were actually entitled to receive text

messages. Instead, to determine whether an individual class member had any contractual right to

receive text messages at the time he or she allegedly experienced a disruption in text messaging

services due to iMessage, the Court would need to examine the terms of the individual class

member's contract. After that inquiry, depending on the particularities of the individual class

member's contract, the Court would then need to determine whether the individual could have

suffered any injury caused by Defendant at all. Tortious interference with contract requires, among

other things, proof of actual breach or actual interference. *See Quelimane*, 960 P.2d at 530. If, for

instance, an individual's contract provided only for a limited number of text messages or allowed

an individual to block all text messages to avoid incurring per-message charges, the Court would

need to examine whether any disruption of text messaging services actually, in fact, occurred, and

if so, whether Defendant's alleged wrongful conduct had any causal relationship to the disruption.

In sum, the Court finds that there are material variations in the proposed class members'

wireless service agreements. These individualized issues will predominate because determining

the fact of injury will require evaluating the particular terms of each individual class member's

wireless service agreement, in order to determine whether Defendant actually caused a breach or

---

[3] The Court further notes that there are other wireless carriers that also provide other contract options that may or may not include text messaging services, limited text messaging services, or other variations on text messaging services. *See, e.g.*, Cox Expert Report at 16, n. 38 (discussing prepaid wireless plans offered by Tracfone Wireless, Leap, MetroPCS, Virgin Mobile, and Boost Mobile).

20

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

interference with the agreement.

### b. Individualized Inquiries Concerning Breach and Causation

Second, and relatedly, the Court finds that Plaintiff has not shown that the alleged contractual breach poses a common, predominating question. Plaintiff contends that "[w]hether iMessage[] actually disrupts the delivery of text messages" is a common question because it "turns on the inner workings of iMessage." Mot. at 21. According to Plaintiff, analyzing whether iMessage as a system disrupts class members' text messages can be done by examining iMessage itself, rather than any "individual inspection of a particular user's phone or device." Mot. at 21 (quoting Green Decl. at ¶ 31). Plaintiff's argument rests on the assumption that iMessage is the only cause of any text message disruption. However, as Defendant notes, there are a "myriad of reasons entirely unrelated" to iMessage that could have resulted in the disruption of text message services for each individual proposed class member. *See* Opp. at 10 (citing Expert Declaration of Dr. John Kelly ¶ 9, ("Kelly Expert Decl."), ECF No. 80-11). In 2007, the average reported delivery failure rate for text messages was 5.1%. Kelly Expert Decl. ¶ 8. Today that would total "almost 400 billion undelivered messages." *Id.* These undelivered messages could be caused by "errors in the cellular network," user-implemented barriers such as blocking a sender, "bugs in the operating system," or applications that interfere with the receipt of text messages. *Id.* ¶ 9. As Defendant's expert details, there are dozens of ways that errors may occur during the transfer of a message to a mobile station. *Id.* at 9, tbl. 1. A proposed class member may therefore have failed to receive a text message, but that nondelivery could have been caused by an error or issue unrelated to Defendant's iMessage service.

Ultimately, Plaintiff may be correct that iMessage has certain design flaws that make it more likely that text messages sent from iPhone users to a proposed class member would be disrupted or not delivered. However, whether that proposed class member's injury was actually caused by iMessage would require individualized inquiries into the circumstances under which the individual class member failed to receive a particular message. This would not only involve assessing the particularities of the terms of an individual's wireless service agreement, but also

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1   whether an individual experienced any disruption in text messaging services, and whether that

2   disruption was caused by iMessage rather than network error, user action, or operating system

3   issues. The Court recognizes that Defendant's arguments with respect to causation go to the merits

4   of Plaintiff's tortious interference with contract claim. Here, the Court considers these merits-

5   based questions "only to the extent" necessary to determining whether Plaintiff's proposed class

6   can satisfy the commonality and predominance requirements of Rule 23. *Amgen*, 133 S. Ct. at

7   1195. The Court does not draw any conclusions about the likelihood of either parties' success on

8   the causation question—only that any determination of liability would necessarily require

9   individualized inquiries which would predominate over the common questions that Plaintiff has

10  identified.

11         Plaintiff contends that Defendant's interference is subject to common classwide proof

12  because, as a matter of tort law, individual class members are not required to "disprove all possible

13  alternative causes of the injury." Reply at 4. Be that as it may, "[i]t is the settled rule in actions for

14  wrongful interference with contract rights that an essential element of the cause of action is that

15  the conduct charged be the procuring cause of the interference and the harm." *Beckner v. Sears,*

16  *Roebuck & Co.*, 4 Cal. App. 3d 504, 507 (Ct. App. 1970); *see also Etolad Music, Inc. v. April*

17  *Music, Inc.*, 139 Cal. App. 3d 697, 706 (Ct. App. 1983) (holding that trial court erred in

18  "instructing the jury that plaintiff had the obligation to prove that defendant was 'a' moving

19  cause" rather than 'the' moving cause" of the contractual interference); *Friwat v. Pack*, No.

20  D046311, 2006 WL 970754, at *3 n.4 (Cal. Ct. App. Apr. 13, 2006) (citing *Beckner* and *Etolad*

21  approvingly).[4] Thus, while Plaintiff might be correct that she and the members of the proposed

22

23  ---
    [4] Plaintiff cites California cases holding that in negligence actions, causation is satisfied where the
    defendant's wrongful act was a "contributory factor." *See* Reply at 5 (citing *Austin v. Riverside*
24  *Portland Cement Co.*, 44 Cal. 2d 225, 234 (1955) ("Defendant's negligence need not be the sole
    cause of an injury . . . ."), and *Barclay Kitchen v. Cal. Bank*, 208 Cal. App. 2d 347, 355 (Ct. App.
25  1962) ("Defendant's negligence need not be the sole cause of an injury to establish liability.")).
    Here, however, Plaintiff's claim for tortious interference with contract is an intentional tort, and as
26  the cases cited above held, require but-for causation. *See Beckner*, 4 Cal. 3d at 507; *Etolad*
    *Music, Inc.*, 139 Cal. App. 3d at706; *Friwat*, 2006 WL 970754, at *3; *see also Dryden v. Tri-*
27  *Valley Growers*, 65 Cal. App. 3d 990, 997 (Ct. App. 1977) ("It has been repeatedly held that a
    plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must
28  ───
    22

United States District Court
Northern District of California

1   class are not required to disprove that any other factors may have also contributed to a disruption

2   of text messaging services, that does not vitiate the threshold burden that Plaintiff and the

3   proposed class must demonstrate that Defendant's alleged wrongful conduct is, in fact, the

4   "procuring cause of the interference." *Beckner*, 4 Cal. App. 3d at 507.

5       In response, Plaintiff focuses on evidence that Plaintiff contends shows that there was a

6   "systematic flaw in Apple's iMessage protocol" which prevented text messages from being

7   delivered to proposed class members.[5] Reply at 5. Even assuming Plaintiff could succeed on the

8   merits of such a claim, an issue which the Court does not reach, Plaintiff has misidentified the

9   relevant question. Here, the question is not whether Plaintiff and members of the proposed class

10  will ultimately be able to prove that iMessage *could* cause disruptions in text messaging services

11  as a general matter. Instead, the relevant question under Rule 23 is whether determining if

12  iMessage caused a class member's injury requires an individualized inquiry such that class

13  treatment is inappropriate. Plaintiff uses the analogy of a telephone subscriber who pays for 30

14  days of a landline service to her home, and a defendant cuts the cord for a 10 day period. During

15  that 10 day period, the subscriber does not make or receive any calls, but, according to Plaintiff,

16  has still suffered an injury because she has paid for 30 days of the right to receive and send calls,

17  but only received 20 days. Plaintiff contends that Defendant here has "cut the cord," so to speak

18  for all proposed class members, regardless of whether or not a class member actually experienced

19  a disruption in text messaging services. The problem with Plaintiff's analogy, however, is that

20  here there is no indication that iMessage actually did interfere with a particular class member's

21  right or ability to receive text message services. Unlike in Plaintiff's analogy, where the fact of

22  cord cutting is taken as a given, for the reasons discussed above, the Court cannot assume that the

23  iMessage system actually interfered with a class member's ability to receive text messages. That

24

25  _____

26  allege that the contract would otherwise have been performed, and that it was breached and
    abandoned by reason of the defendant's wrongful act and that such act was the moving cause
    thereof."); 5 Witkin, Summary of Cal. L. § 738 (2005 10th ed.) (listing cases).

27  [5] The Court notes that Plaintiff does not contend that this "systematic flaw" resulted in a proposed
    class member necessarily experiencing undelivered text messages.

28
    Case No.14-CV-02269-LHK
    ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    iMessage could have "cut the cord" does not establish that it did, or that such a proposition is

2    subject to classwide proof. The uncertainty with respect to the actual cause of a particular class

3    member's injury renders Plaintiff's analogy inapt.

4        Similarly, Plaintiff submitted the Ninth Circuit's recent decision in *Baker v. Microsoft*

5    *Corp.*, --- F.3d ---, No. 12-35946, 2015 WL 4393964 (9th Cir. July 20, 2015), presumably in

6    support of her argument that injury can be shown on a classwide basis. In *Baker*, the Ninth Circuit

7    relied on its decision in *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010),

8    to conclude that where all proposed class members alleged the same injury from a common defect,

9    the degree of injury or "individual manifestations" of the defect did not defeat certification. In

10   other words, because all the proposed class members "alleged the same injury from a defect[]," the

11   "individual manifestations of the defect were relevant 'to the extent of [plaintiffs'] damages and

12   not whether [plaintiffs] possess the same interest and have suffered the same injury as the class

13   members.'" *Baker*, 2015 WL 4393964, at *5 (quoting *Wolin*, 617 F.3d at 1173–75). In *Baker*, the

14   plaintiffs alleged that Microsoft's Xbox game system had a design defect that resulted in

15   "scratched [game] discs that are rendered permanently unplayable." *Baker*, 2015 WL 4393964, at

16   *1. The *Baker* plaintiffs alleged express and implied breach of warranty claims. Two different

17   district courts, both the *Baker* court and the *In re Microsoft Xbox 360 Scratched Disk Litigation*,

18   No. C07-1121, 2009 WL 10219350 (W.D. Wash. Oct. 5, 2009), court concluded that individual

19   issues of fact and law predominated because the design defect only "actually manifest[ed] in fewer

20   than one percent" of Xboxes, though the plaintiffs alleged each and every Xbox was sold with the

21   design defect that allegedly breached Microsoft's express and implied warranties. *See id.* at 2. The

22   Ninth Circuit reversed in *Baker*, explaining that while a proposed class member might not have

23   actually experienced a scratched disk, he or she did purchase a defective Xbox that allegedly

24   breached Microsoft's warranties. *Baker*, 2015 WL 4393964, at *5

25       Here, in contrast, not all class members can allege that they have suffered the same injury

26   of suffering interference with their contractual right to receive text messages because of iMessage.

27   Unlike in *Baker*, where each proposed class member actually purchased a defective good, and

28
                                                    24
     Case No.14-CV-02269-LHK
     ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

therefore suffered the same injury of an alleged breach of warranty, in the instant case a proposed class member's loss of text messages may have been caused by reasons other than any iMessage flaw. Moreover, some class members did not have a wireless service contract that included text messaging services; thus, there was no contractual right with which Defendant could tortiously interfere. Accordingly, class members may not have suffered actual interference and thus cannot state a tortious interference with contract claim. In *Baker*, by contrast, the fact of a "design defect itself [allegedly breached] the express warranty." *Baker*, 2015 WL 4393964, at *6. Thus, whether a design defect existed posed a common, predominating question. As Plaintiff and the proposed class cannot demonstrate with classwide proof actual interference or breach, the Court finds *Baker* to be inapposite.

In sum, the Court is not persuaded that the question of whether iMessage is the cause of any contractual breach or interference satisfies the commonality requirement under Rule 23(a), much less the predominance requirement under Rule 23(b). The "common contention" required under Rule 23(a) "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. Even if, on the merits, Plaintiff is correct that iMessage has systematic flaws that could result in the disruption of text messaging services, that determination does not assist the Court in determining whether iMessage actually caused the proposed class members to suffer any interference. As discussed above, individualized inquiries will be necessary to determine which class members suffered interference with their wireless service agreements and whether that interference was caused by iMessage. The material variations in wireless service agreements, including whether a proposed class member had any contractual right to text messages in the first place, will require the Court to examine individual contracts to determine the fact of injury. These individualized inquiries, which strike at the heart of Plaintiff's claims against Defendant, would "degenerat[e] into a series of individual trials" on issues material to any showing of liability. *See Gene And Gene LLC*, 541 F.3d at 326. Under these circumstances, the Court concludes that judicial economy would not be served by class treatment.

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

*See In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d at 958 ("Whether judicial economy will be served in a particular case turns on close scrutiny of the relationship between the common and individual issues.").

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for class certification. The Court concludes that Plaintiff's proposed class includes, by definition, proposed class members who could not have suffered any injury and that individualized questions with respect to Defendant's liability will predominate over any common questions of law or fact.

**IT IS SO ORDERED.**

Dated: August 4, 2015

_____

LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

Case No.14-CV-02269-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION